Jennifer L. Hess (JS3684)
Jacob S. Reichman
RIEMER HESS LLC
Attorneys for Plaintiff
275 Madison Avenue, 26ᵗʰ Floor
New York, NY 10016
Phone: (212) 297-0700
Fax:    (212) 297-0730
jhess@riemerhess.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

BARBARA DORNAU,                                    1:21-CV-4144

                          Plaintiff,              **COMPLAINT**


          -against-                                ECF CASE


HARTFORD LIFE & ACCIDENT INSURANCE
COMPANY,

                          Defendants.

-------------------------------------------------------------------X

Plaintiff Barbara Dornau ("Dornau"), by her attorneys at Riemer Hess LLC, complaining of

Defendant Hartford Life & Accident Insurance Company ("Hartford"), alleges:

1.       This is an action arising under the Employee Retirement Income Security Act of 1974,

as amended ("ERISA"), 29 U.S.C. §1001, *et seq.*, to recover disability benefits owed to Dornau under

her employer's employee benefit plan ("LTD Plan"), to clarify the rights of Dornau to future benefits

under the plan, and to recover attorneys' fees, interest, and costs.

## JURISDICTION AND VENUE

2.       This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA, 29

U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.  Under Section 502(f) of ERISA, 29 U.S.C. § 1132(f), this

Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

3.      Venue is properly in this District pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), in that the breaches took place in this District and Hartford resides or may be found in this District.

## DORNAU'S PARTICIPATION IN THE
## LONG TERM DISABILITY PLAN

4.      Dornau is a 52-year-old marketing professional who last worked as a senior marketing associate for Ernst & Young, L.L.P. ("Ernst & Young") – a multinational accounting firm.

5.      At all relevant times, Dornau was and is a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7), in the LTD Plan.

6.      At all relevant times, the LTD Plan is and has been an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

7.      Long term disability benefits under the LTD Plan have been funded by insurance policy no. GP-818967, issued by Aetna Life Insurance Company ("Aetna").

8.      Upon information and belief, Hartford acquired Aetna and assumed all liability and obligations under policy no. GP-818967.  Collectively, Hartford and Aetna will be referred to as "Hartford."

9.      At all relevant times, Hartford is and has been the claims administrator of the LTD Plan within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. § 1002(16)(A).

10.     At all relevant times, Hartford is and has been a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

11.     As an employee at Ernst & Young, Dornau was provided with long term disability insurance coverage under the LTD Plan.

## STANDARD OF REVIEW

12.     This case is subject to *de novo* review because the LTD Plan document does not contain an effective grant of discretionary authority to Hartford.

13.     Even if the LTD Plan document effectively granted discretionary authority to Hartford, this matter is nonetheless subject to *de novo* review because Hartford failed to comply with the Department of Labor's ("DOL") claims-procedure regulations, 29 CFR § 2560.503-1.

14.     Upon information and belief, Hartford has not adopted claim procedures in accordance with the DOL regulations.

15.     Due to Hartford's procedural violations, including Hartford's failure to provide Dornau with a full and fair review, Hartford forfeited its entitlement to any deference granted by the LTD Plan document.

16.     For these reasons, this case is subject to *de novo* review.

## HARTFORD CONCEDED THAT DORNAU WAS DISABLED FROM ANY REASONABLE OCCUPATION

17.     This is a dispute involving Hartford's termination of Dornau's previously approved long term disability benefits under the LTD Plan.

18.     Hartford paid Dornau disability benefits for more than 10 years before Hartford unilaterally reversed benefit approval and wrongfully terminated Dornau's benefits effective July 18, 2020.

19.     Dornau's longstanding disability results from two chronic medical diagnoses: irritable bowel syndrome ("IBS") and migraine headaches.

20.     Dornau's IBS and migraine headaches initially became disabling in 2009, at which point she only needed to demonstrate an inability to perform the demands of her own occupation as an account manager to be eligible for benefits under the LTD Plan.

21.     In 2009, Dornau's worsening IBS and migraine symptoms prevented her from meeting both the physical and cognitive demands of her own occupation in a sustained, reliable, and predictable manner.

22.     Dornau filed for disability benefits with Hartford alleging disability in 2009.

23.     Hartford approved Dornau's disability benefit application, which alleged disability beginning in 2009, and found her to be eligible for benefits within the meaning of the LTD Plan. Hartford continued paying Dornau benefits through 2011.

24.     In 2011, the standard of disability under the LTD Plan changed and required Dornau to be "Disabled" from a "Reasonable Occupation" in order to remain eligible for benefits.

25.     For the period 2011 through present, the LTD Plan's applicable definition of "Disability" is as follows: "[Y]ou will be deemed to be disabled on any day if you are not able to work at any reasonable occupation solely because of:  disease; or injury."

26. The LTD Plan defines a "Reasonable Occupation" as follows:

> This is any gainful activity for which you are; or may reasonably become; fitted by: education; training; or experience; and which results in; or can be expected to result in; an income of more than 60% of your adjusted pre-disability earnings.

27.     After 2011, Hartford repeatedly reinvestigated and continuously approved Dornau's disability benefits under the Reasonable Occupation standard from 2011 until July of 2020.

28.     Despite the evidence demonstrating no significant improvement or change in Dornau's conditions, Hartford wrongfully terminated benefits effective July 18, 2020.

## DORNAU'S MEDICAL CONDITIONS
## CONTINUE TO RENDER HER DISABLED BEYOND JULY 18, 2020

29.     Dornau continues to suffer from disabling symptoms of migraine headaches and IBS, which are severe enough to cause Disability under the LTD Plan's Reasonable Occupation standard from July 18, 2020 to date.

30.     A Reasonable Occupation under the LTD Plan would require Dornau to work reliably, predictably, and consistently.

31.     Dornau's symptoms from both IBS and migraines make her incapable of reliably,

predictably, and consistently performing the demands of a Reasonable Occupation.

32.     Dornau suffers from chronic, severe, and frequent migraine headaches that cause serious symptoms, including:

- nausea;

- dizziness;

- loss of vision;

- serious imbalance;

- insomnia and sleep issues;

- vertigo;

- right side numbness;

- poor concentration;

- confusion;

- phonophobia; and

- photophobia.

33.     Dornau's migraine symptoms often exacerbate her IBS.

34.     Dornau's migraine symptoms are easily provoked and triggered by bright lights, motion, noise, and positional changes.

35.     Often, Dornau's migraines are brought on unpredictably and without warning or triggers.

36.     Dornau has tried numerous medications to treat her migraine related symptoms including: Aimovig; Cambia; Emgality; Botox; Antivert; Naprosyn; Lamotrigine; Levetiracetam; Topamax; Relpax; Neurontin; Tramadol; Diclofenac Sodium; and Ajovy.  In addition to oral medications, Dornau has received IV Magnesium and Tylenol, as well as Botox injections every three

months to treat her migraines.  None of these medications have provided substantial, lasting relief.

37.     The medications Dornau's providers prescribed for her migraines have caused her to experience side effects, such as: severe palpitations; nausea; body aches; hives; sleepiness; and difficulty breathing.

38.     Dornau's severe migraines occur more than 15 days of the month without warning and the only way for Dornau to get relief is to lie down in a dark and silent place.  This will cause Dornau to be frequently absent from work and off task while at work.

39.     To date, Dornau's migraines are unpredictable in frequency, severity, and duration, but are consistently severe and frequent enough to prevent her from performing a Reasonable Occupation.

40.     In addition to her migraine symptoms, Dornau suffers from IBS symptoms that are chronic, severe, and frequent.

41.     Dornau's IBS symptoms include diarrhea and bowel movements up to 8 times a day, causing Dornau to be in the bathroom up to an hour each time.

42.     Dornau's IBS symptoms occur unpredictably, often without warning or triggers.

43.     Dornau's IBS causes cramping, abdominal pressure, and pain, which often increase the severity of her migraines.

44.     Dornau has tried numerous medications to treat her IBS, including: anti-spasmodics; omeprazole; Viberzi; Xifaxan; Zofran; Lomotil; and Librax.  None have provided significant, lasting relief.

45.     Dornau cannot perform a Reasonable Occupation because she has no control over her IBS symptoms and frequent bowel movements.

46.     Dornau's IBS is unpredictable in frequency, severity, and duration, but her symptoms are frequent and severe enough to preclude work in a Reasonable Occupation.

47.     Dornau's IBS often causes severe diarrhea 6-8 times a day, and the onset is so sudden that she occasionally does not make it to the bathroom.  Dornau spends up to an hour in the bathroom per trip.  After each of these episodes, Dornau is often tired and in severe pain.

48.     Both Dornau's IBS and migraines, as well as the side effects from the medications Dornau takes to treat these disorders, prevent her from performing the skill and cognitive requirements of any Reasonable Occupation.  Symptoms from migraines often prevent Dornau from reading and concentrating and cause her to slur her words.  The IBS symptoms cause Dornau to take frequent rest breaks – making it nearly impossible for her to focus on one cognitive task for a sustained period.

49.     Dornau's IBS and migraines– whether considered independently or in combination – prevent Dornau from completing a normal workday and a normal work week.

50.     A reasonable employer would not tolerate Dornau's frequent absences, unpredictable workday disruptions, and necessary time spent off task caused by her IBS and migraine symptoms.

**Dornau Submitted Substantial Medical Evidence Demonstrating Her Disability**

51.     Dornau provided medical evidence to Hartford which consistently demonstrated her inability to perform a Reasonable Occupation on a consistent, reliable, and full-time basis from July 18, 2020 to the present, and that there has been no significant change or improvement in her condition to justify Hartford's reversal of her previously approved benefits.

52.     Dornau submitted an August 10, 2020 statement from her treating neurologist, Dr. Robert Duarte, which described Dornau's severe migraines over the prior two years.  Specifically, Dr. Duarte stated:

> Ms. Dornau has been a patient since 2014, and presents with severe chronic migraines, with and without aura that have been increasing in number and intensity.  She is debilitated many times during these episodes.
> [. . . .]

She has had increasing episodes over the past two years where she has numbness on the right side of her body, nausea, loses vision, has slurred speech, weakness, and confusion between left and right.  These most recent episodes occurred 3 times in the last 4 months.  She currently receives Botox injections every three months and reports headaches are worse and increase after the first month and a half of treatment.  Her headaches have not been controlled in her last visits.

53.     In his August 10, 2020 statement, Dr. Duarte described the correlation and connection between Dornau's Migraines and her IBS.  Specifically, Dr. Duarte stated:

Ms. Dornau also suffers from debilitating IBD/gastrointestinal issues.  Studies have concluded that migraine headaches have a correlation with irritable bowel syndrome and GI disorders, of which Dornau has a strong history of and patients with GI symptoms have a higher prevalence of migraine headaches.

54.     In his August 10, 2020 statement, Dr. Duarte concluded that Dornau's migraines are disabling:

Having treated Ms. Dornau on a regular basis for the past 7 years, I feel she fits the criteria for disability due to her debilitating migraine symptoms, lack of response and negative side effects from multiple medications and therapies, her MRI results, and her gastrointestinal issues.  There is no doubt in my mind that Ms. Dornau is disabled [due] to her condition and is unable to perform any meaningful steady employment.

55.     In a second statement, Dr. Duarte again confirmed his initial opinion that Dornau has remained disabled.  Specifically, Dr. Duarte stated:

Due to her chronic migraines and the debilitating symptoms . . . . it is impossible for Ms. Dornau to work in any occupation.  She is limited in her physical capacity as she needs to be in bed during migrainous events and not able to focus, sustain attention, communicate with others, understand instructions, lift, stand, walk or exert herself. While she was employed, she was unable to perform the most basic of duties due to her migrainous features.  Having treated Ms. Dornau on a regular basis for 7 years and due to my years as a Board Certified Neurologist, Director of Pain Management, and Assistant Professor of Neurology, I stand by my initial conclusion that she is disabled from all types of work.

56.     Dornau also submitted notes from her May 20, 2020 appointment with Dr. Duarte. These notes – written just two months before Hartford terminated her benefits – support her

continued disability and corroborate Dr. Duarte's August 10, 2020 statement.  The notes document that Dornau's migraines caused her to remain bed ridden for four days per week.

57.     Dornau submitted an August 17, 2020 statement from her treating gastroenterologist, Dr. Joseph Tromba, confirming that Dornau remained unable to work due to her IBS , which he confirmed was not responding to medication.

58.     Dr. Tromba has extensive clinical familiarity with Dornau because he has treated Dornau for the past 27 years.

59.     In Dr. Tromba's statement dated August 17, 2020, he confirmed that Dornau has 6-8 bowel movements a day, he stated: "The patient has various medical issues which include migraine headaches as well as orthopedic issues, but her major issue is that of recalcitrant diarrhea.  The patient has six to eight bowel movements a day, sometimes nocturnal."

60.     In Dr. Tromba's statement dated August 17, 2020, he described how Dornau's IBS prevented her from effectively working, he stated:

> She requires high dose anti-diarrheal during the day, and in spite of all this, she still has bowel movements.  This prevents her from concentrating, and also she is unable to use mass transit or other means of transportation due to the concern of an unexpected bowel movement.

61.     In Dr. Tromba's August 17, 2020 statement, he confirmed that numerous medications have been ineffective in treating Dornau's IBS, he stated:

> In the past she has been taking Viberzi and Omeprazole. She has tried Xifaxan as well as high dose antispasmodics.  She also undergoes symptomatic treatment for her nausea with Zofran and is currently on multiple doses of Lomotil.  Again, in spite of this her diarrhea is uncontrolled.

62.     Dornau submitted objective evidence to Hartford demonstrating her migraines.

63.     On July 13, 2020, Dornau underwent an MRI of her brain, which showed subcortical white matter hyperintense foci.  The impression report noted that these findings have "been described

in the setting of chronic migraine headaches."

64.     The 2020 MRI findings of Dornau's brain were consistent with previous MRI findings over the last ten years, specifically those taken on November 18, 2009, November 16, 2011, and December 30, 2016.

65.     Dornau's migraine symptoms were so severe in 2020 that she went to the emergency room on December 15, 2020, due to symptoms of numbness; loss of vision; imbalance; and confusion. The attending physician concluded that Dornau's symptoms were due to migraines. During the neurological exam, the attending physician observed that Dornau had right sided hemiparesis; facial droop; right visual field deficit; and paresthesia – objective abnormalities which cannot voluntarily be reproduced at will.

**Hartford's Own Clinical Consultants Did Not Anticipate Significant Medical or Functional Improvement**

66.     Hartford's own reviewing medical consultants consistently concluded that no substantial medical or functional improvement was anticipated.

67.     Hartford conducted a clinical consultant review on January 14, 2014, during which Hartford's clinical consultant concluded that Dornau was still disabled and that "it is not anticipated any significant functional improvement will occur."

68.     A clinical consultant from Hartford concluded on June 27, 2018, that "there was no significant improvement expected d/t [due to] the longevity of her chronic complaints."

69.     In July of 2019, Hartford conducted an internal clinical consultation that concluded that the medical information continued to prove Dornau's disability, and that significant improvement was not expected.  Specifically, Hartford's reviewing consultant stated that:

> The chronicity of migraine symptoms has not had any significant change as evidenced in the medical from 2017 to 2019.  Her symptoms have been reported consistently between office visits.  She has continued to have frequent headaches at 15+ per month

despite numerous botox injections, medication changes and additions. She did not respond to Aimovig injections and it had been increased, she also tried Cambia. In late 2018 she saw a chiropractor and also an ENT for the dizziness. In late 2018, she was able to complete one final treatment of Aimovig and then switch to Emgality in 2019, all while undergoing Botox injections every 3 months. A significant change in her migraine condition is tenuous due to the chronicity of symptoms and poor to mediocre response to treatment.

70.     On or around November 21, 2019, Hartford prepared an offer to buyout the future value of Dornau's claim for $278,383 (the "November 21, 2019 offer").

71.     According to Hartford, the November 21, 2019 offer represented approximately 75 percent of Hartford's calculation of the future value of Dornau's claim at that time.

72.     Hartford made the November 21, 2019 offer after Hartford's clinical consultant review of Dornau's file in July 2019.

73.     Upon information and belief, Hartford only offers a substantial buyout offer to a claimant if Hartford first determines that no substantial medical and/or functional improvement is anticipated.

74.     Hartford's November 21, 2019 offer to buyout Dornau's benefits is contrary to Hartford's July 2020 termination of her benefits, just eight (8) months later.

**The Social Security Administration Approved Dornau's Disability Claim**

75.     Dornau was approved for Social Security Disability Benefits with a date of disability starting in 2009 and has continued to receive them to date.

76.     Over the past eleven years, the Social Security Administration continually assessed Dornau's claim and determined each time that Dornau remains disabled.

77.     Hartford's termination of Dornau's benefits stands in stark contrast to the Social Security Administration's determination that Dornau remains totally disabled.

**HARTFORD RELIED ON UNRELIABLE AND FLAWED EVIDENCE
TO WRONGFULLY TERMINATE DORNAU'S BENEFITS**

78.     By letter dated July 20, 2020, Hartford terminated Dornau's benefits effective July 18, 2020.

79.     Hartford's July 2020 termination of Dornau's benefits was in the absence of any substantial evidence that Ms. Dornau's condition had significantly improved or changed.

80.     Hartford's July 2020 termination of Dornau's benefits ignored and dismissed reliable, contemporaneous material evidence – both from Dornau's treatment providers and Hartford's internal medical review, which affirmatively disproved any significant improvement or change in Dornau's condition.

81.     Hartford claimed that Dornau did not present any objective evidence, however Hartford gave no explanation for why the 2020 MRI does not qualify as objective evidence.  Hartford had accepted MRIs with similar findings without issue for ten years.

82.     The only justification Hartford gave for its termination of Dornau's benefits, was the flawed and unreliable report of Hartford's non-examining medical reviewer, Dr. Lucien Parillo.

83.     The evidence Hartford relied upon in initially terminating Dornau's benefits was similarly flawed.  Hartford incorrectly relied on the report of its reviewing physician, Dr. Lucien Parillo, who never even examined Dornau in person.

84.      Dr. Parillo's report and conclusions were biased, incorrect, unreliable, and conclusory.

85.     Dr. Parillo does not reference any improvement or change in the severity of Dornau's disorders over the past eight years.

86.     Dr. Parillo specializes in sports and internal medicine and is thus not qualified to comment on Dornau's conditions.  Dornau's IBS and migraines should have been evaluated by a neurologist and/or a gastroenterologist prior to termination of her benefits.  In fact, Dr. Parillo states several times, "I defer any determination of impairment or disability regarding the patient's psychiatric diagnoses or neurocognitive symptoms to the appropriate medical specialty."

87.     Dr. Parillo did not speak to Dornau or any of Dornau's treatment providers when writing his report.

88.     Dr. Parillo references an alleged lack of objective evidence supporting Dornau's impairment.  Yet, fails to credit the numerous MRI scans showing subcortical white matter foci which are consistent with severe migraine headaches.  These MRIs serve as objective evidence of Dornau's migraines.  Indeed, the MRI impression reports specifically indicated the connection and correlation with migraines.

89.     Hartford's reliance on the unreliable non-examining report of Dr. Parillo was unreasonable because:

    a.  He demanded more objective evidence than Hartford previously had, despite Hartford having already approved and paid Dornau's claim for over 10 years;

    b.  His opinion cannot be reconciled with the other opinions of Hartford's own reviewing physicians, which included admissions about a chronic disability and lack of anticipated improvement;

    c.  He failed to credit objective evidence, including abnormal MRIs;

    d.  He conducted a selective, cherry-picked review of the evidence that overemphasized evidence to support his conclusions and deemphasized evidence that supported Dornau's ongoing disability;

    e.  He is not qualified to comment on Dornau's IBS;

    f.  He is not qualified to comment on Dornau's chronic migraines;

    g.  He ignored the side effects of Dornau's medications;

    h.  His opinions are infected by Hartford's inherent conflict of interest;

    i.  His opinions are biased;

    j.  His conclusions lack foundation and are conclusory;

k.   His conclusions were inconsistent with the weight of the evidence;

l.   He never spoke with or examined Dornau in person;

m.   He incorrectly found that there was no objective evidence despite evidence to the contrary; and

n.   He failed to consider Dornau's subjective symptoms.

90.   Dornau appealed Hartford's benefit termination and submitted substantial new evidence, including statements from her treating providers and records documenting her emergency room visit due to migraines on December 15, 2020.

91.   Despite overwhelming evidence of Dornau's disability, Hartford denied Dornau's appeal by letter dated January 7, 2021.

92.   In upholding its termination of benefits, Hartford did not conduct an in-person examination of Dornau or add any new substantive or examining evidence to the file.

93.   On appeal, Hartford failed to present any evidence that Dornau's condition had significantly improved or changed from 2009 to the present.

94.   In denying Dornau's appeal, Hartford merely relied on non-examining paper review reports from gastroenterologist Dr. Jeffrey Danzig and neurologist Dr. Mostafa Farache.

95.   The reports of Hartford's non-examining reviewers, Dr. Danzig, and Dr. Farache, were unreliable, flawed, and riddled with conclusory opinions.

96.   Dr. Danzig conducted a flawed and selective review of the evidence.

97.   In his November 24, 2020 report and December 31, 2020 addendum, Hartford's reviewer, Dr. Danzig, ignored Dornau's history of medications and extensive treatment.  Dr. Danzig was silent with respect to whether Dornau's IBS was reasonably controlled with medications.  Instead, Dr. Danzig only offered a generalized opinion on how the diagnosis "usually" responds to medications in other cases.  Specifically, Dr. Danzig opined, "Though IBS causes urgency and diarrhea, it's usually

able to be reasonably controlled with one or another medication. There are no progress notes documenting these symptoms and further, these are all subjective complaints without any objective findings at all."

98.     Dr. Danzig stated that he reviewed Dr. Tromba's August 17, 2020, letter.  However, Dr. Danzig ignored the portion of Dr. Tromba's August 17, 2020 letter that confirmed the different medications Dornau had tried and how none of those medications brought her relief.

99.     Dr. Danzig offered a conclusory opinion that Dornau's IBS would only cause Dornau to have 3-4 bowel movements *during an 8-hour workday*, rather than the 6-8 bowel movements *per day*, as assessed by the treating gastroenterologist, Dr. Tromba.  In offering his conclusion, Dr. Danzig assumes – without foundation – that Dornau's bowel movements occur on a timer at the same time every day, like clockwork, which is not the case.  Her frequency of bathroom trips varied from day to day, and her IBS symptoms are unpredictable.

100.    Dr. Danzig offered another conclusory and generalized opinion that a bathroom trip duration of up to one hour is not consistent with a diagnosis of IBS, rather than Dr. Tromba's assessment that each of Dornau's bathroom visits for a bowel movement could take up to one hour. In offering this conclusion, Dr. Danzig did not support this opinion with any medical literature.  Nor did he explain any other foundation for his opinion, which was directly contrary to the assessments and observations of Dornau's long term treating providers.

101.    Hartford's reliance on the non-examining report of Dr. Danzig was unreasonable.

102.    The report from Dr. Danzig, together with his addendum, is unreliable because:

      a.   His opinion cannot be reconciled with the other opinions of Hartford's own prior reviewing physicians, which included admissions about a chronic disability and lack of anticipated improvement;

      b.   His opinion cannot be reconciled with the conclusions of the Social Security

Administration finding that Dornau is unable to work;

c. He conducted a selective, cherry-picked review of the evidence that overemphasized evidence to support his conclusions and deemphasized evidence that supported Dornau's ongoing disability;

d. He failed to consider all relevant information;

e. His opinion was infected by conflict and bias;

f. His conclusions lacked foundation and are conclusory;

g. He failed to consider the chronic nature of Dornau's condition and the lack of significant improvement;

h. He never examined Dornau in-person, which is particularly relevant given the complexity and recurrent, chronic nature of Dornau's conditions;

i. His conclusions are inconsistent with the weight of the evidence; and

j. He failed to consider Dornau's subjective symptoms.

103. Neither Dr. Danzig's report nor his addendum mentioned any medical improvement in Dornau's condition from 2009 to the present, despite Hartford having paid disability benefits to Dornau for over 10 years.

104. Dr. Tromba has been treating Dornau for 27 years, and his opinion is much more reliable than Dr. Danzig's non-examining medical report.

105. The November 27, 2020 report of Hartford's reviewing neurologist, Dr. Farache, as well as his January 7, 2021 addendum, are similarly flawed and unreliable.

106. Dr. Farache incorrectly concluded that there were no objective findings of Dornau's migraines. However, there is substantial objective medical evidence in the file, including abnormal MRIs and the findings from Dornau's December 15, 2020 emergency room visit. During the neurological exam on December 15, 2020, the attending physician observed that Dornau had right

sided hemiparesis; facial droop; right visual field deficit; and paresthesia – objective abnormalities which cannot voluntarily be reproduced at will.

107.    Dr. Farache "cherry picked" from the available evidence by only acknowledging one finding from the 2020 MRI, while ignoring the other findings that the results have consistently "been described in the setting of chronic migraines."

108.    Dr. Duarte directly responded to Dr. Farache's report in a statement submitted with Dornau's appeal.  There, Dr. Duarte specifically emphasizes the existence of objective evidence:

> Many of the diagnostic exams listed, such as MRI, MRA, Doppler and EEG are not used to diagnosis migraines but for purposes to rule out other conditions.  The normal results do not rule out her diagnosis of migraines.  The note in [Dr. Farache's report] from 7/13/2020 for the MRI of the brain only mentions nonspecific bifrontal subcortical hyperintense foci but the note fails to mention the remaining finding stating, "which has been described in the setting of chronic migraine headaches." There are also three other MRIS from 11/18/2009, 11/16/2011, and 12/30/2016, with the same finding of subcortical white matter hyperintense foci within the frontal regions, which is observed and consistent with migraine headaches.  Contrary to the review, Ms. Dornau has objective findings.

109.    Dr. Duarte went on to describe Dornau's recent appointment at his office, Dr. Duarte stated:

> In a recent office visit, she had transient difficulty holding a pen to fill out office documents during a migraine attack, and had to lower the lights due to severe photophobia.  In addition, her pain scale was noticeably increased upon touching her scalp and neck when giving Botox to the extent she was tearing up.  Ms. Dornau also had to excuse herself to vomit while in the office.

110.    Dr. Farache never discussed or reviewed the hospital notes provided by Dornau relating to her December 15, 2020, emergency room visit because of her migraines.  These notes provide important contemporaneous evidence of the severity of Dornau's migraines.  During the neurological exam, the attending physician concluded that Dornau had right sided hemiparesis, facial droop, right visual field deficit and paresthesia.  These are objective abnormalities which cannot

voluntarily be reproduced at will.

111.    Dr. Farache mischaracterized the medical evidence.  Specifically, Dr. Farache states that the notes from Dornau's physical therapy do not describe any migraine symptoms.  However, the physical therapist was treating Dornau for her hip and not her migraines and the physical therapist had no reason to describe any migraine symptoms in their notes.

112.    Dr. Farache failed to consider the physical and cognitive side effect of medications that Dornau was taking.  Dr. Duarte concluded that "Medications have had little to no results with side effects and allergic reactions such as severe palpitations, nausea, body aches, hives and difficulty breathing."

113.    Dr. Farache does not reference any improvement in Dornau's condition.

114.    Hartford's reliance on the non-examining report of Dr. Farache was unreasonable.

115.    Dr. Farache's non-examining report is unreliable because:

    a.    He demanded more objective evidence than Hartford previously had, despite Hartford having already approved and paid Dornau's claim for over 10 years;

    b.    His opinion cannot be reconciled with the other opinions of Hartford's own reviewing physicians, which included admissions about a chronic disability and lack of anticipated improvement;

    c.    He incorrectly reported and omitted key findings from diagnostic results of the brain;

    d.    He failed to credit objective evidence, including abnormal MRIs;

    e.    He failed to credit the objective findings from Dornau's December 15, 2020 visit to the emergency room;

    f.    He never examined Dornau in-person, which is particularly relevant given the complexity and recurrent, chronic nature of Dornau's conditions;

g.   He failed to consider all relevant information;

h.   His opinion was infected by conflict and bias;

i.   His conclusions lacked foundation and are conclusory;

j.   He cherry picked from the available evidence;

k.   He failed to consider the chronic nature of Dornau's condition and the lack of significant improvement;

l.   His conclusions are inconsistent with the weight of the evidence;

m.   He incorrectly found that there was no objective evidence despite evidence to the contrary; and

n.   He failed to consider Dornau's subjective symptoms.

## HARTFORD'S CONFLICT OF INTEREST

116.   At all relevant times, Hartford has been operating under an inherent and structural conflict of interest because, on the one hand, Hartford is liable for benefit payments due to Dornau and, on the other hand, each payment issued depletes Hartford's assets.

117.   Hartford's determination was influenced by its conflict of interest.

118.   The contradistinction between Hartford's termination of Dornau's benefits in July 2020, and its tacit admission of November 21, 2019 that Dornau's condition will not improve is an instance of Hartford's inherent conflict of interest directly impacting Dornau's claim.

119.   Hartford's conflict of interest extended to and infected its non-examining paper reviewers, including Dr. Parillo, Dr. Danzig, and Dr. Farache.

**Hartford's Cozy Relationship with Dr. Parillo, Dr. Danzig, and Dr. Farache**

120.   Neither Dr. Parillo, Dr. Danzig nor Dr. Farache are impartial physicians.

121.   Upon information and belief, Dr. Parillo, Dr. Danzig, and Dr. Farache are each repeat players working for insurers within the disability insurance industry.

122.     Upon information and belief, Dr. Parillo, Dr. Danzig, and Dr. Farache have conducted reviews in connection with numerous other individuals insured by Hartford.

123.     Upon information and belief, Dr. Parillo, Dr. Danzig and Dr. Farache, are contractors hired and/or retained by Hartford, either directly or through a third-party vendor.

124.     Hartford contracts with its paper file medical reviewers, including Dr. Parillo, Dr. Danzig and Dr. Farache, based on their reputation for outcomes in contested cases and the likelihood of support for a claim denial.

125.     Hartford knows, or has reason to know, that its in-house medical consultants and the medical consultants hired and/or retained to complete file reviews serve insurance companies, rather than the individual claimants.

126.     Upon information and belief, Hartford pays substantial sums of money to its medical consultants, whether in-house or independent contractors, to conduct reviews for Hartford's insureds.

127.     Because the medical consultants derive substantial income from performing file reviews for Hartford's insureds, the medical consultants have an incentive to provide file reviews that Hartford deems favorable in order to perform future file reviews for Hartford.

128.     Hartford has failed to take active steps to reduce potential bias and to promote the accuracy of its benefit determinations.

## **COUNT I (LTD Plan)**

129.     Dornau repeats and re-alleges the allegations set forth in paragraphs 1 through 128 above.

130.     Hartford had no legal basis for terminating Dornau's LTD benefits.

131.     Under the terms of the LTD Plan, Hartford agreed to provide Dornau with certain disability insurance benefits under the LTD Plan, in accordance with the terms and conditions set forth therein.

132.     Hartford has failed and refused to pay Dornau the LTD benefits to which she is rightfully entitled, from July 18, 2020 through the present date.

133.     Dornau has satisfied all conditions precedent under the LTD Plan and is thus eligible to receive benefits beyond July 18, 2020.

134.     Hartford's determination that Dornau is no longer disabled within the meaning of the LTD Plan effective July 18, 2020, is contrary to the terms of the LTD Plan, contrary to the medical evidence, unreasonable, and an abuse of discretion.

135.     Hartford has financial conflicts of interest with respect to handling, monitoring, and eventually denying Dornau's disability benefits.

136.     Hartford was influenced by its financial conflict of interest, as both the administrator of the LTD Plan and the payor of benefits thereunder, when deciding to deny Dornau's disability benefits.

137.     The unlawful behavior of Hartford is evidenced by the following:

    a.  Denying ongoing benefit payments to Dornau at a time when it knew that she was entitled to said benefits under the terms of the LTD Plan, in bad faith and contrary to the LTD Plan;

    b.  Unreasonably withholding payments from Dornau knowing her ongoing claim for benefits was valid;

    c.  Unreasonably failing to pay ongoing benefits without having any evidence, substantial or otherwise, supporting its decision to terminate benefits;

    d.  Terminating previously approved benefits in the absence of significant medical improvement;

    e.  Ignoring Dornau's treating providers' assessments of her medical conditions, without any basis or explanation for doing so in violation of 29 C.F.R. § 2560.503-

1(h)(2)(iv);

f.  Relying on non-examining medical consultants to deny a claim supported by the treating providers;

g.  Dismissing the diagnostic testing and objective medical evidence;

h.  Relying on non-examining medical consultants who did not consider or comment on all relevant information, including whether Dornau could perform the regular occupational demands required for her specialty;

i.  "Cherry-picking" and selectively highlighting certain factors in medical or reviewing reports to cast a favorable light on its position, while ignoring the conclusions and reports of Dornau's treating providers regarding the conditions for which they render treatment;

j.  Completely disregarding Dornau's subjective complaints, her own assessment of her medical conditions, and how they restrict and limit her ability to perform the duties of any reasonable occupation in violation of 29 C.F.R. §2560.503-1(h)(2)(iv);

k.  Engaging in a pattern of procedural irregularities to advance its own corporate interests in terminating benefits, to the detriment of LTD Plan participants;

l.  Failing to provide a "full and fair review" as Hartford was obligated to do pursuant to 29 C.F.R. §2560.503-1(h)(4);

m.  Failing to provide Dornau with an adequate description of any additional material or information necessary to perfect her claim in violation of 29 C.F.R. §2560.503-1(g)(1)(iii);

n.  Failing to maintain and utilize "reasonable claims procedures" as it was obligated to do pursuant to 29 CFR § 2560.503-1(b), in violation of ERISA;

o.  Consistently acting in its own corporate interests instead of those of the LTD Plan

and its participants;

p.  Failing to render a timely decision on appeal in accordance with 29 C.F.R. §2560.503-1(i);

q.  Failing to ensure that Dornau's claim and appeal for disability benefits were adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision, as Hartford was obligated to do pursuant to 29 C.F.R. §2560.503-1(b)(7).

138.  Hartford's unlawful behavior and violations of ERISA's procedural regulations were purposeful and harmful to Dornau.

139.  A "higher than marketplace" quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), applies to evaluating the actions of Hartford in this case.

140.  Hartford violated the higher-than-marketplace standards that ERISA imposes on insurers.

141.  Hartford was required to discharge its fiduciary duties "solely in the interests of the participants and beneficiaries of the plan."

142.  Hartford breached its fiduciary duty by failing to fairly review and reasonably interpret the reports prepared by Dornau's treating providers; failing to consider other material relevant to her medical condition; and terminating benefits in the absence of medical improvement.

143.  Instead, Hartford created a false rationale for terminating Dornau's disability benefits. Hartford selectively highlighted certain factors in medical reports in order to cast a favorable light on its position, while misinterpreting or ignoring the conclusions of Dornau's treating providers about the conditions for which they rendered treatment/evaluation.

144.  Hartford required objective evidence for the conditions of IBS and Migraines when no reliable objective testing exists for these conditions.

145.    Hartford failed to provide a full and fair review to Dornau during her administrative appeal.

146.    Hartford failed to provide Dornau a full and fair review by failing to specify what information was necessary for her to perfect her appeal.  Hartford merely informed Dornau that she could send "Any information you didn't already send us.  This could mean medical records, test results or anything else, that's shows why you weren't able to do your job."

147.    Although Hartford criticized Dornau's claim for not containing objective evidence, Hartford never gave Dornau any notice about what kind of objective evidence Hartford wanted to perfect the appeal.

148.    Hartford placed its financial interests in reducing its expenses and increasing its profitability above Dornau's interests under the LTD Plan to receive ongoing disability benefits.

149.    Dornau has been forced to bring the instant action as a direct result of Hartford's unlawful benefit denial and violations of the LTD Plan and ERISA.

150.    Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), Dornau is entitled to recover disability benefits under the LTD Plan that have not been paid to date, with interest, and those that will become due in the future.

## COUNT II (Attorney Fees and Costs)

151.    Dornau repeats and re-alleges the allegations set forth in paragraphs 1 through 128 above.

152.    By reason of Hartford's failure to pay Dornau benefits due under the terms of the LTD Plan, Dornau has been forced to retain attorneys to recover such benefits, for which she has and will continue to incur attorneys' fees.

153.    Dornau is entitled to recover reasonable attorneys' fees and the costs of this action, pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1).

**WHEREFORE**, Dornau demands judgment against Hartford:

A.    For the amount of all long-term disability benefits due under the terms of the LTD Plan that have not been paid, together with interest thereon;

B.    Clarifying and declaring that the LTD Plan is obligated to pay Dornau long term disability benefits in the future as required by the LTD Plan;

C.    For the costs of this action and Dornau's attorney's fees, pursuant to Section 502(g) of ERISA, 29 U.S.C. § 1132(g)(1);

D.    For such other and further relief as may be deemed just and proper by the Court.

Dated:  New York, New York
        May 10, 2021

By:     /s/ Jennifer L. Hess                .
        Jennifer L. Hess
        Jacob S. Reichman
        RIEMER HESS LLC
        Attorneys for Plaintiff
        275 Madison Avenue, 26th Floor
        New York, New York 10016
        (212) 297-0700
        jhess@riemerhess.com